## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------x
MACEDONIA CHURCH, et al.,       :
                                :
      Plaintiffs,               :
                                :
v.                              :      Civil No. 3:05CV00153(AWT)
                                :
LANCASTER HOTEL LIMITED         :
PARTNERSHIP, MASSPA REALTY      :
CORPORATION, and FINE           :
HOTELS CORP.,                   :
                                :
      Defendants.               :
-----------------------------x
```

## RULING ON RENEWED MOTION FOR CLASS CERTIFICATION

This action arises out of an effort by predominantly
African-American congregants and affiliates of Macedonia Church,
in South Norwalk, Connecticut, to reserve lodging at the
Lancaster Host Resort and Conference Center ("Lancaster Host") in
Lancaster, Pennsylvania.  The complaint alleges that the
defendants, Lancaster Hotel Limited Partnership, MASSPA Realty
Corporation, and Fine Hotels Corp., denied the group
accommodations because of their race, in violation of 42 U.S.C.
§ 1981.  The proposed plaintiff class seeks certification
pursuant to Rules 23(b)(1)(B) and 23(b)(3).  The current
plaintiffs named in the action are Macedonia Church, Rev. Dewitt
Stevens, Jr. ("Stevens"), Merle Rumble ("Rumble"), Albert Ray
Dancy ("Dancy"), Cynthia Welfare Johnson ("Johnson"), and Sandra
Hart ("Hart").  The plaintiffs propose a class of "Macedonia

Church and those members of Macedonia Church, and those relatives or friends of Macedonia Church members, who participated in a church trip to Lancaster Pennsylvania on July 9-10, 2004, and were denied accommodations at the Lancaster Host." (Renewed Motion for Order Determining That Action Proceed as Class Action (Doc. No. 207)("Pls.' Mot.") at 1.) For the reasons set forth below, the motion is being granted.

## I. FACTUAL BACKGROUND

The court makes the following findings of facts based on the deposition testimony, affidavits, and exhibits submitted by the parties. See In re Initial Pub. Offering Sec. Litig. (In re IPO), 471 F.3d 24, 27, 41 (2d Cir. 2006)([in adjudicating a motion for class certification, "all of the evidence must be assessed as with any other threshold issue"; "the judge [must] resolve[] factual disputes" relevant to the motion).

Sometime in February 2003, Rumble visited Lancaster Host to determine its suitability for a group outing. She met with Bonnie Skagen, a sales representative, and the two discussed information about Lancaster Host in the lobby for about fifteen minutes. During this time, Rumble said that she was interested in scheduling a group outing there and Skagen gave her a business card and brochure about Lancaster Host. Rumble found Skagen "pleasant" during her visit. (Deposition of Merle Rumble, (Aug. 2005)("Rumble Dep.") at 50:7.)

In April 2004, Stevens, his wife Addie Stevens, Rumble, and assistant pastor Michael Rumble (her husband), all African-Americans, traveled to Lancaster, Pennsylvania, to attend Sight and Sound, a religious-themed musical production, and determine whether such a trip would be suitable for a group trip the church was planning for that summer. The group met with Skagen to assess the merits of rooming at Lancaster Host.

Lancaster Host, before being sold to a third party in July 2004, was owned by defendants MASSPA Realty Corporation and Lancaster Host Limited Partnership. Fine Hotels Corporation exercised management responsibilities. As of June 2004, around 160 full-time employees serviced Lancaster Host, which consisted of 330 hotel rooms and 500,000 square feet of space.

Lancaster Host maintained different departments devoted to booking. The group sales department consisted of four sales managers, one of whom was Skagen. Skagen was solely responsible for attracting business from social, medical, military, educational, religious, and fraternal groups seeking to reserve 50 rooms or fewer. Sales managers like Skagen received an incentive bonus for meeting certain targets; they also would take proposed or tentative group reservations that could collectively exceed available rooms.

After a brief tour, the group and Skagen made preliminary arrangements for reserving approximately 40 rooms for the dates

of July 8-9, 2004.  The group talked with Skagen for at least half an hour.  At one point, Rumble became the contact person on behalf of Macedonia Church with regard to the reservations. Skagen stated that she would send Rumble an introductory letter containing information such as room availability, pricing, and arrival and departure dates.  Skagen also told Rumble that a signed contract would be necessary to confirm any reservation. Rumble described Skagen's demeanor as "pleasant, cordial" and seemingly "willing to work" with the group on the reservations. (Deposition of Merle Rumble, (Aug. 2005)("Rumble Dep.") at 85:3-4.)

Around the same time, Rumble and Stevens announced to the congregation that they would be staying at Lancaster Host during their trip.  Johnson described Rumble's "presentation about the planned activities and the itinerary of activities that we were planning to do." (Deposition of Cynthia Welfare Johnson ("Johnson Dep.") at 56:3-5.)  "She had a brochure, and she was reading off different activities that it had listed in their brochure . . . [a]nd everyone was getting excited because it was free. Well, it was included in your stay."  (Johnson Dep. at 64:2-7.)  Hart states that when the pastor first presented the trip, "he also explained about his excitement of the accommodations that we were going to be having."  (Deposition of Sandra Hart ("Hart Dep.") at 62:1-3.)  Hart also mentioned at this church meeting that Rumble

-4-

stated that the lodging accommodations "were part of the resort areas that we were going to." (Hart Dep. at 57:24-25.) Dancy remembers Rumble stating that "the place where we were making accommodations was a family type center, a lot of activities, [that Stevens, Addie Stevens, Rumble, and Michael Rumble] had been there and were very impressed with the place, and that they were excited that the church would have the opportunity to lodge there." (Deposition of Albert Dancy ("Dancy Dep.") at 48:20-25.) Stevens mentioned that it was "a nice resort area, something to look forward to . . . it was a trip for families, et cetera." (Hart Dep. at 62:7-9);(see also Rumble Dep. at 111:9 - 112:17.)

A sign up sheet was created. The sheet did not reference Lancaster Host, but instead was entitled "Noah - The Musical, Lancaster, Pa, July 9, 10" (Deposition of Rev. DeWitt Stevens ("Stevens Dep.") at Ex. 1.) This referenced the show that they would see at Sight and Sound. Hart also recalls that at different periods of time there was a price given for the contract and a deadline for payment. It was expected that the participants in the trip to Lancaster would pay the church which would then take care of the payment to Lancaster Host.

On April 21, 2004, Skagen sent a document to Rumble. The defendants characterize this letter as providing "promotional information" (Defendants Response Brief in Opposition to Plaintiffs' Renewed Motion for Class Certification ("Defs.'

Opp.") at 13-14), and having "accurately confirmed what Rumble had represented regarding the number of rooms that Macedonia Church was tentatively seeking, as well as the arrival and departure dates that Rumble had quoted to Skagen the day before." (Id. at 14.)  The plaintiffs describe it as "a written proposal describing the amenities at Lancaster Host and the room rates" but without any specification of the number of rooms to be occupied.  (Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification ("Pls.' Br.") at 2.)  Nevertheless, Rumble interpreted the written material as having "locked in" reservations at Lancaster Host.  (Rumble Dep. at 131:8.)

Rumble and Skagen next spoke on May 10, 2004.  During this conversation, Rumble told Skagen that the group would be postponing the arrival date from Thursday, July 8, 2004 to Friday, July 9, 2004 and that they would be adding a Sunday to their reservation.  A few days later, Rumble received a revised proposal letter dated May 10, 2004.  The letter described reservations of twenty unspecified rooms for July 8 and July 9, and stated "[d]ue to the tentative status of your function, we are presently not holding space for your group.  However, if this proposal meets with your approval, we will be happy to reserve the appropriate space and send you an agreement."  (Deposition of Bonnie Skagen ("Skagen Dep.") at Ex. 12.)  On May 17, 2004, Rumble contacted Skagen by telephone and advised her that the

dates were incorrect, as well as the number of rooms.  Rumble asked Skagen to send her a contract for reservations of 40 rooms for July 9 and 10.  The parties disagree whether Rumble said "tentative contract" or merely "contract." (Pls.' L. R. 56(a)(2) Stmt. (Doc. No. 208, Ex. 1) at ¶ 39.)

On May 26, 2004, Skagen left a voicemail message for Rumble regarding the reservations.  Rumble returned the call on June 1 and 2, but Skagen was out.  On June 3, they talked, and while the defendants claim that Skagen placed Rumble on hold momentarily to check on room availability and then returned to say that the 40 rooms were not available, the plaintiffs are unsure whether she in fact looked.  Skagen apologized for the lack of room availablility.  After discussing the situation with Rumble, Stevens contacted Skagen, who told him that there had been an error in the booking process.  Rumble traveled to Lancaster Host on June 8, and asked to speak with Skagen about what had happened.  Skagen explained that Lancaster Host did not have enough available rooms after the sales and reservations departments reconciled information on the definite bookings that each department had secured.

Stevens was informed by Rumble that their "reservations were canceled." (Stevens Dep. at 145:14.)  When he heard about what had transpired, he enlisted a Caucasian friend of the Church, Judith Addington ("Addington"), to attempt to make reservations

for the same weekend for a similar group.  Christopher Nonirit,
an African-American male, also participated.  On June 11,
Addington telephoned Skagen and told her that she was a
coordinator for a group of Methodist and Congregational church
members in Connecticut who required 30 rooms for July 9 and 10.
Skagen confirmed that the rooms were available for those days and
sent out a contract on the same day.  Addington received a faxed
copy of a tentative contract which quoted 35 rooms instead of 30
rooms.  On June 21, 2004, Addington called Skagen to increase the
reservations by an additional 15 rooms, and Skagen indicated that
the rooms were avalaible to meet her increased order.

Sometime in June 2004, Stevens announced that a different
hotel would host the outing, but provided no reason for the
change.  Hart characterized Stevens as announcing that while they
had pursued the hotel to reserve rooms for it, "[t]here was a
breakdown at some point", (Hart Dep. 85:9), and that "they had
another person call to try to make reservations for the same time
that we wanted reservations, and the reservations were
available."  (Hart Dep. 85:10-13.)  Stevens said that "they were
sorry that we weren't going to be able to stay where we
originally intended, and that they were seeking equivalent
accommodations." (Dancy Dep. at 53:6-7.)  The reaction in the
congregation to Steven's description of the allegations was
"[d]issapointment." (Hart Dep. at 85:16.)  Rumble avers that

"before we went, we met with everyone that was going so they understood we were going to Lancaster, we are not staying where we planned to stay, pastor asked them make sure what [sic] everyone does, we want to make sure everything flows properly and when we come back there was more information that would be shared with the congregation." (Deposition of Merle Rumble, Sept. 30, 2005 ("Rumble Dep2") at 129:8-14.)

The group eventually secured accommodations at the Ramada Inn in Lancaster. They found their experience to be less than ideal; the Ramada Inn lacked virtually all the amenities of Lancaster Host. Additionally, members observed what they believed to be prostitutes soliciting in the lobby, drug transactions in the neighborhood, and a late night fight in the street outside of the hotel requiring a police response.

In late June and early July, 2004, Skagen telephoned Addington on two occasions to express her regret that the "Addington group" would not be able to come. Skagen left messages that the group would be welcome at Lancaster Host in the future and solicited them to come at any time. Such calls were not made to Macedonia Church.

Lancaster Host often books more rooms than the hotel has available, and this most frequently occurs for Friday and Saturday dates in July in any given year. Lancaster Host also maintains a netting system that estimates the number of room

cancellations or block drops from the gross reservations that prospective customers have placed.  Lancaster Host insists that on July 9 and 10, 2004, the hotel had no room vacancies for either date.

## II. LEGAL STANDARD

To maintain a class action, plaintiffs must meet the requirements of Rule 23(a) of the Federal Rules of Civil Procedure-numerosity, commonality, typicality, and adequacy of representation-and show that the putative class falls within one of the three categories set forth in Rule 23(b).  See Fed. R. Civ. P. 23; In re IPO, 471 F.3d at 33.  The plaintiffs bring this putative class action under Rule 23(b)(1)(B) and Rule 23(b)(3). In analyzing the relevant standards for class certification, the Second Circuit stated:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a

partial trial of the merits.

Id. at 41.

It thus overruled the holding in Caridad v. Metro-North
Commuter R.R., 191 F.3d 283 (2d Cir. 1999), which permitted
courts to certify a class based on "some showing" of compliance
with the Rule 23 requirements.  Id. at 292.  The party seeking
certification has the burden of demonstrating that the
requirements of Rule 23 are satisfied.  See Amchem Prods., 521
U.S. at 613-14.  "[T]he preponderance of the evidence standard
applies to evidence proffered to establish Rule 23's
requirements."  Teamsters Local 445 Freight Div. Pension Fund v.
Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).

A certified class, of course, may be decertified or modified
in later stages.  Woe by Woe v. Cuomo, 729 F.2d 96, 107 (2d Cir.
1984).  "An order [certifying a class] may be altered or amended
before final judgment."  Fed. R. Civ. Proc. 23(c)(1)(C);
Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d
134, 139 (2d Cir. 2001)(noting the district court's ability "to
alter or modify the class, create subclasses, and decertify the
class wherever warranted."

**III. DISCUSSION**

    **A.  "Implicit" Class Considerations**

The court notes that "there are implicit requirements for
the existence of an identifiable class and for the named

representatives being members of the proposed class."  5 <u>Moore's</u>
<u>Federal Practice</u> § 23.20 (3d ed. 2009).

### 1. Identifiable Class

"[T]he requirement that there be a class will not be deemed
satisfied unless the description of it is sufficiently definite
so that it is administratively feasible for the court to
determine whether a particular individual is a member."  7A
Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal</u>
<u>Practice and Procedure</u> § 1760, at 139-140 (3d ed. 2005); <u>see</u> <u>In</u>
<u>re A.H. Robins Co., Inc.</u>, 880 F.2d 709, 728 (4th Cir.
1989)("Though not specified in the Rule, establishment of a class
action implicitly requires both that there be an identifiable
class and that the plaintiff or plaintiffs be a member of such
class"), <u>abrogated on other grounds</u>, <u>Amchem Prods., Inc. v.</u>
<u>Windsor</u>, 521 U.S. 591 (1997).  "An identifiable class exists if
its members can be ascertained by reference to objective
criteria."  <u>In re Methyl Tertiary Butyl Ether ("MTBE") Prods.</u>
<u>Liab. Litig.</u>, 209 F.R.D. 323, 337 (S.D.N.Y. 2002).  The question
of whether it would be "administratively burdensome" for the
court to determine whether a particular individual is a class
member is "primarily one of manageability, and not
ascertainability."  <u>Id.</u> at 337 n.20.

Here, there is an identifiable class and the individual
plaintiffs are members of that class.  The individual plaintiffs

-12-

contend that their rights under § 1981 were violated when they
were denied accommodations at Lancaster Host.  Section 1981
provides that "[a]ll persons within the jurisdiction of the
United States shall have the same right in every State and
Territory to make and enforce contracts . . . and to the full and
equal benefit of all laws and proceedings for the security of
persons and property as is enjoyed by white citizens."  42 U.S.C.
§ 1981(a).  "To establish a claim under § 1981, a plaintiff must
allege facts in support of the following elements: (1) the
plaintiff is a member of a racial minority; (2) an intent to
discriminate on the basis of race by the defendant; and (3) the
discrimination concerned one or more of the activities enumerated
in the statute (i.e., make and enforce contracts, sue and be
sued, give evidence, etc.)."  Mian v. Donaldson, Lufkin &
Jenrette Secs. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).  The
plaintiffs are clearly predominantly members of a racial
minority.  The question is whether the proposed plaintiff class
may share in enforcing a contract and whether the defendants were
impairing the rights of the proposed class members to enjoy the
benefits of a contractual relationship on the basis of race.

    The court finds that Macedonia Church, and not the
individual plaintiffs, was the proposed party to the contract.
The individual plaintiffs, are third-party intended beneficiaries
of the contract under § 1981.  The court's legal analysis in this

issue is set forth in is earlier ruling.  See <u>Macedonia Church v.</u>
<u>Lancaster Hotel Ltd. P'ship</u>, 560 F. Supp. 2d 175, 180 (D. Conn.
2008).

In <u>McDonald v. Domino's Pizza, Inc.</u>, the Supreme Court
declined to speak on the issue of whether a third-party
beneficiary to a contract could bring a claim under § 1981. <u>See</u>
546 U.S. 470, 476 n.3 (2006) ("[W]e do not mean to exclude the
possibility that a third-party intended beneficiary of a contract
may have rights under § 1981.  Neither do we mean to affirm that
possibility.").  The Second Circuit confirmed that a third-party
beneficiary to a contract may bring claims under § 1981 in <u>Olzman</u>
<u>v. Lake Hills Swim Club, Inc.,</u>  495 F.2d 1333, 1339 (2d Cir.
1974).  In determining whether a party is a third-party
beneficiary to a contract for the purposes of a § 1981 claim, the
court looks to the law of the forum state.  <u>See, e.g.,</u> <u>Kinnon v.</u>
<u>Arcoub, Gopman, & Assocs., Inc.,</u> 490 F.3d 886, 890-91 (11th Cir.
2007) (applying Florida law); <u>Barfield v. Commerce Bank, N.A.,</u>
484 F.3d 1276, 1278 (10th Cir. 2007) (applying Kansas law).
Connecticut law makes clear that "the ultimate test to be applied
[in determining whether a person has a right of action as a third
party beneficiary] is whether the intent of the parties to the
contract was that the promisor should assume a direct obligation
to the third party [beneficiary]." <u>Dow & Condon, Inc. v.</u>
<u>Brookfield Develpment Corp.,</u> 266 Conn. 572, 580-81 (2003).

The court finds that the individual putative class members were intended third-party beneficiaries of the proposed contract between Macedonia Church and Lancaster Host. In their position as intended beneficiaries of the contracting parties, they may bring suit under the contract.[1]

Also, the defendants argue that the definition of the plaintiffs' proposed class is too imprecise because of "inconsistent quotes" among the deponents as to how many class members exist and "scratched out" names in the group sign-in sheet of three proposed class members. (Defs.' Opp. at 17.) Thus, the defendants assert that the only way to identify the class members is "by asking each individual Plaintiff whether they actually participated in the 2004 outing—a highly individualized inquiry, requiring a myriad of mini-trials, undermining any basis for certification." (Id.) However, the total number of potential class members is a finite and very manageable number. The number as to whom there is likely to be a reasonable ground for dispute will be relatively small and determinations could be made in a simple proceeding, if needed.

    **2.   Whether the named plaintiffs are part of the class.**

The court finds the named plaintiffs to be part of the

_____

[1] On the issue of whether third-party beneficiaries can maintain a § 1981 action under a proposed contract, the court's legal analysis is as set forth in its previous ruling on that point in this case. See Macedonia, 560 F. Supp. 2d at 182-82.

-15-

proposed class under the third-party beneficiary analysis, and
the defendants have not argued otherwise.

**B. Numerosity**

The plaintiffs have proposed a class that consists of
approximately 112 class members. "While there is no
predetermined number of plaintiffs necessary to certify a class,
courts generally have found a class consisting of 40 or more
members to be sufficient." Collins v. Olin Corp., 248 F.R.D. 95,
101 (D. Conn. 2008)(citing cases). "Courts have not required
evidence of exact class size or identity of class members to
satisfy the numerosity requirement." Robidoux v. Celani, 987
F.2d 931, 935 (2d Cir. 1993).

In the instant matter, there are clearly more than 40
members. Moreover, the efficiencies of a class action in the
instant matter, where all claims center on the same set of
events, are apparent.

**C. Commonality and Typicality**

"[T]he commonality and typicality requirements tend to merge
into one another, so that similar considerations animate analysis
of Rules 23(a)(2) and (3)." Marisol A. v. Giuliani, 126 F.3d
372, 376 (2d Cir. 1997). This is because "both serve as
guideposts for determining whether . . . the named plaintiff's
claim and the class claims are so inter-related that the

interests of the class members will be fairly and adequately protected in their absence." Caridad, 191 F.3d at 291.

Commonality requires plaintiffs to demonstrate "issues of law and fact common to the class." Amchem, 521 U.S. at 607. "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." Marisol A., 126 F.3d at 376. Minor factual differences will not preclude class certification if there is a common question of law. See Monaco v. Stone, 187 F.R.D. 50, 61 (E.D.N.Y. 1999). For considerations of typicality, "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992). Among the considerations are "whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 510 (S.D.N.Y. 1996); see also Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 200 (S.D.N.Y. 1992)("[T]ypicality is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.").

The plaintiffs' general argument for class certification on these factors hinges on their claim that the putative classmembers collectively experienced the inferior accommodations and that "[a]ll sought the benefits of the same lodging relationship with the defendants." (Pls.' Br. at 13.) The defendants distinguish between the (i) organizers and non-organizers, (ii) those plaintiffs signing up for the outing and/or paying in advance before Macedonia Church attempted to contract with the defendants, and (iii) those members of the proposed class who signed up or paid after the church announced plans that the accommodations were canceled. However, as explained above, Connecticut law requires only the intent of the parties that the promisor should assume a direct obligation to the third party beneficiary. Dow, 266 Conn. at 580-81. The logistics of the third-party beneficiaries' participation in the outing, such as how and when they signed up, whether they led the organizing or not, are immaterial to their status as persons whom the contracting parties intended a direct obligation to.

The defendants also argue that since some of the proposed class members were minors at the time of the attempted contracting with Lancaster Host, at least some were "captive to the wishes" of their guardians, (Defs.' Opp. at 19), thus not manifesting an intent to enter into a contract, and that one would have to also determine whether each minor paid for his

trip.  In support, the defendants cite <u>Jackson v. Tyler's Dad's</u>
<u>Place, Inc.</u>, 850 F. Supp. 53 (D.D.C. 1994).  In that case, two
African-American plaintiffs claimed that they were refused tables
at a restaurant based on their race.  When they entered the
restaurant, they were told that the dining room was fully
reserved, but that they were welcome to eat at the bar. They
declined and left.  They later called the restaurant, and were
then informed that tables were available.  They then returned to
the restaurant and complained about what happened, but did not
attempt to sit and order.  The court, in rejecting their § 1981
claim, noted that because the plaintiffs "never asked to be
seated during the second visit," they "never sought to enter a
contractual relationship on that occasion."  <u>Id.</u> at 56 n.6.  The
case here is quite different, however, as the third-party
beneficiary need not intend to enter into a contractual
relationship.  They are neither promisors nor promisees.  <u>See</u>
<u>supra</u> p.15.

        The defendants also argue that whether each class member
even knew about Lancaster Host or otherwise based his or her
reason to participate in the 2004 outing on hotel accommodations
presents another set of individualized determinations.  (Defs.'
Opp. at 20.)  However, as noted above, since the class members
were third-party beneficiaries, this inquiry is not material.

        After noting that the church prioritized keeping the

-19-

reservations over rescheduling alternative lodging dates at Lancaster Host, the defendants also state that other individualized questions would include, after it was determined that alternative accommodations would need to have been made, "(1) whether each individual Plaintiff was informed about the dilemma; (2) what degree of involvement or influence, if any, did each individual Plaintiff have concerning that priority, and (3) whether each individual Plaintiff agreed (or would have agreed if informed) regarding Macedonia Church's decision." (Defs.' Opp. at 20.) Any such factual differences are minor in light of the significance of the common question as to whether the third-party beneficiaries' rights were violated in connection with the attempt by Macedonia Church to secure accommodations at Lancaster Host.[2]

The defendants argue that there is a question as to whether the individual plaintiffs have standing to sue. These arguments were addressed and rejected in <u>Macedonia</u>. <u>See</u> 560 F. Supp. 2d at 183.

The defendants also argue that the highly individualized

_____

[2] This analysis is also relevant to the defendants' argument that the Church opted not to use the rooms that Addington had tentatively reserved on their behalf, and that there are further individualized questions "as to whether and how many individual Plaintiffs would have preferred and/or agreed to execute independent contracts with Defendants to lodge in the remaining rooms that Lancaster Host had available." (Defs.' Opp. at 21.)

nature of the plaintiffs' claims for compensatory and punitive damages further defeats commonality and typicality. They cite to deposition testimony regarding the difficulty some of the plaintiffs named in the lawsuit have in quantifying or estimating what their damages are. However, even if there are some individualized damage issues, "[c]ommon issues may predominate when liability can be determined on a class-wide basis. . . ." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 139 (2d Cir. 2001).

The defendants argue that part of the class is proceeding on a completely separate and distinct legal theory, in that five of the proposed class members are either white or Hispanic friends of the black members of the proposed class. The court has already addressed this argument. See Macedonia, 498 F.Supp.2d at 498 n.2 ("The court notes that the fact that some of the plaintiffs are Caucasian does not preclude them from bringing a claim under 42 U.S.C. § 1981 based on discrimination that they suffered as a result of their association with African Americans." (quoting DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 312 (2d Cir. 1975))). Such considerations apply equally to Hispanic affiliates of the church group.

In sum, there is present here a common core of operative facts that gave rise to common legal questions in the plaintiffs' claims. All the alleged injuries arose from a single occurrence:

the alleged wrongful denial of accommodations to the group of third party beneficiaries at one point in time. The court therefore finds the plaintiffs to have met the commonality and typicality requirements.

### D. Adequacy

Rule 23(a)(4) requires that representative parties "fairly and adequately protect the interests of the class." "A plaintiff can show that it adequately represents the interests of the class, pursuant to Rule 23(a)(4), if it appears that plaintiff's interests are not antagonistic to those of the class it seeks to represent and plaintiff's counsel is qualified to conduct the litigation." In re Flight Safety Technologies, Inc. Sec. Litig., 231 F.R.D. 124, 128 (D. Conn. 2005). The court notes that the defendants do not object to the conduct and participation of plaintiffs' counsel in this matter, and the court finds that their work on behalf of the plaintiffs meets the applicable standard.

Rather, the defendants identify Rumble, Dancy, and Stevens, several of the proposed representative plaintiffs, as failing to meet the standard. In gauging adequacy, courts may consider the "honesty and trustworthiness of the named plaintiff" in judging the "adequacy of representation." Savino v. Computer Credit Inc., 164 F.3d 81, 87 (2d Cir. 1998).

The defendants first argue that Rumble cannot adequately

represent the interests of the proposed class because of the supposed missteps she took in organizing the outing.  They assert that she misrepresented that she had confirmed reservations for Lancaster Host when there had not been an actual contract signed.  The court finds that this argument is without merit.

Nor does the court find persuasive the arguments against Dancy that he is not suitable "primarily because Dancy was convicted of third degree larceny. . . ."  (Defs.' Opp. at 29.)  While courts have found that some plaintiffs are not credible due in part to their having been convicted of impeachable crimes, Dancy since his conviction, has served as an outreach coordinator for the church's AIDS ministry and as the project director for the Cornerstone Community Development Corporation, a nonprofit agency serving the social needs of the community.  The court concludes he should not be disqualified.

Finally, the defendants state that Stevens is not an adequate class representative "because his status within Macedonia Church, as the spiritual leader of Macedonia Church, the leader of the Board of Elders, and the leader of the Board of Directors, creates conflicts of interest with the balance of the proposed class."  (Defs.' Opp. at 29.)  The defendants analogize the occurrence, in employment discrimination settings, of conflicts of interests whenever a supervisor attempts to represent non-supervisory personnel.  They invoke, inter alia,

Arnett v. American Nat. Red Cross, 78 F.R.D. 73, 75 (D.D.C. 1978).  There, a plaintiff, who had served in a supervisory capacity and brought a suit against the defendant Red Cross, sought to certify the class as all black applicants for employment and all employees of the defendant who have applied for employment or who have been employed at any time at the Red Cross.  The court found that the plaintiff could not adequately protect the interests of non-supervisory personnel because of a conflict of interest; in his capacity as a supervisor, he had routinely acted on behalf of management, having been responsible for hiring, firing, and evaluating non-supervisory personnel.  See id. 74-75.  By contrast, Stevens has never worked with the defendants, nor "been a part of the practices he is now challenging."  Cf. id. at 76.

Finally, the defendants assert that because the named plaintiffs' claim "is a loser from the start" (Defs.' Opp. at 30, quoting Robinson v. Sheriff of Cook County, 167 F.3d 1155, 1157 (7th Cir. 1999)), the representative plaintiffs do not have sufficient incentive to be active in the suit.  This argument is without merit.

### E. Rule 23(b) Considerations

In addition to satisfying the four prerequisites of Rule 23(a), the proposed class action must also be "maintainable" under one of the three categories found in Rule 23(b)(1)-(3).  In

re Simon II Litig., 407 F.3d 125, 132-33 (2d Cir. 2005).  The

plaintiffs have sought to certify the class under Rule

23(b)(1)(B) and under Rule 23(b)(3).

### 1.  Rule 23(b)(1)(B)

Rule 23(b)(1)(B) provides that a class action may be

maintained only if "prosecuting separate actions by or against

individual members of the class would create a risk of . . .

adjudications with respect to individual class members that, as a

practical matter, would be dispositive of the interests of the

other members not parties to the individual adjudications or

substantially impair or impede their ability to protect their

interests."  Id.; In re Drexel, 960 F.2d at 291-292 ("Rule

23(b)(1)(B) permits a class action to be maintained if a

congeries of individual actions would 'impair or impede' the

interests of other members of the putative class.").  The type of

suit usually involved under the rule is the limited fund class

action, in which "'claims are made by numerous persons against a

fund insufficient to satisfy all claims.'" Cnty. of Suffolk v.

Long Island Lighting Co., 907 F.2d 1295, 1303 (2d Cir. 1990)

(quoting Fed. R. Civ. Proc. 23, Adv. Comm. Notes).  "Classic

illustrations [of a limited fund class action] include . . .

insurance proceeds. . . ."  1 Herbert Newberg & Alba Conte,

Newberg on Class Actions § 4.9, at 35 (4th ed. 1992).

As an initial matter, the defendants argue that since the

plaintiffs' Second Amended Complaint does not include a request for Rule 23(b)(1)(B) certification, class certification should be denied as beyond the scope of their complaint and untimely. The plaintiffs claim, however, that through the course of discovery they have identified a liability insurance policy of $5 million, and no other assets. Therefore, the court will consider the applicability of Rule 23(b)(1)(B).

The Supreme Court has set forth several criteria for the traditional limited fund class action. Of relevance here is the fact that "[t]he first and most distinctive characteristic is that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." Ortiz v. Fibreboard Corp., 527 U.S. 815, 838 (1999). The Court also noted that parties must submit "evidence on which the district court may ascertain the limit and the insufficiency of the fund, with support in findings of fact following a proceeding in which the evidence is subject to challenge. . . ." Id. at 849.

The plaintiffs attempt to distinguish the definitive language of Ortiz by arguing that the Ortiz Court was preoccupied with a limited fund created through settlement agreement, not by operation of the disclosed liability coverage. (Pls.' Reply at 9-10.) However, although Ortiz involved certification of a

settlement class, the Court did not limit its discussion to settlement classes, see id. at 832-841, but rather referred to the distinguishing characteristics as "the essential premises of mandatory limited fund actions." Id. at 848. Thus, while it appears the defendants are no longer engaged in operating Lancaster Host, the fact that the plaintiffs have discovered that defendants have a $5 million liability insurance policy is not dispositive. The defendants aver that they are not insolvent or bankrupt, implying that they have other assets subject to class claims, and thus the plaintiffs could recover monetary damages directly from the defendants. While the proceeds of the policy could be used to pay any award, there has been no evidence that it would be the only source of payment for any award. Ortiz requires that evidence be submitted so the court can determine the limit of the potential payout. The evidence in the record at present is insufficient to support a finding that the only asset is the policy or that it is inadequate to satisfy all claims. Thus, the request for certification under Rule 23(b)(1)(B) is being denied.

### 2. Rule 23(b)(3)

The plaintiffs also seek to certify the proposed class under Rule 23(b)(3). A Rule 23(b)(3) class action may be certified if the court finds that: (1) the questions of law or fact common to the members of the class predominate over any questions

affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  <u>See</u> Fed. R. Civ. P. 23(b)(3). The proposed class is appropriate for certification under Rule 23(b)(3).

### a. Predominance

Courts frequently analyze the Rule 23(a)(2) commonality requirement along with the Rule 23(b)(3) predominance requirement.  <u>In re Natural Gas Commodities Litig.</u>, 231 F.R.D. 171, 180 (S.D.N.Y. 2005).  However, the predominance requirement "is a more demanding criterion than the commonality inquiry under Rule 23(a)."  <u>Moore v. PaineWebber, Inc.</u>, 306 F.3d 1247, 1252 (2d Cir. 2002)(citing <u>Amchem</u>, 521 U.S. at 623).  To meet the predominance requirement of Rule 23(b)(3), the plaintiffs must establish that the case is subject to generalized proof applicable to the class as a whole.  <u>In re Visa</u>, 280 F.3d at 136. In particular, courts should "focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions." <u>Dura-Bilt Corp. v. Chase Manhattan Corp.</u>, 89 F.R.D. 87, 93 (S.D.N.Y. 1981); <u>see</u> <u>also</u> <u>Scott v. Aetna Servs., Inc.</u>, 210 F.R.D. 261, 267 (D. Conn. 2002) ("whether [the defendant] acted improperly . . . is the common liability issue that predominates over all other factual and legal issues.").

The defendants, in arguing that common questions do not predominate over individual ones, reiterate their previous arguments that individualized assessments are necessary to determine:

> (1) whether each individual Plaintiff maintained a contractual relationship and had enforceable contractual rights with Defendants, (2) whether each individual Plaintiff has standing to sue in this matter; (3) each individual Plaintiff's knowledge, interest, intention, or special requirements (such as room type, costs, etc.) on lodging at the Lancaster Host, (4) the causation deficiencies concerning how each member learned of Defendants' alleged wrongdoing, including what was reported (and not reported) to him or her; (5) the inherently subjective liability issues concerning each member's alleged damages given the absence of any quantifiable or measurable damages common to the group; and (6) the legal defenses unique to each individual contract such as the legal competency of minors 'as young as three and four' years of age to contract with Defendants, associational discrimination, and judicial[] estoppel.

(Defs.' Opp. at 34.) As to concerns (1) and (2), the court has already decided that the contractual position was that of a third-party beneficiary, and that each beneficiary of the contract has standing to sue. The court has found points (3) and (4) are not material. Also, point (6) has also been disposed of. (See Section III(C).) See also In re Visa, 280 F.3d at 138 ("[T]he fact that a defense 'may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.'"(quoting Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000))).

Point (5) concerns whether individual damage assessments predominate over other common issues. In <u>Carey v. Piphus</u>, 435 U.S. 247 (1978), the Court held, in the context of a § 1983 claim, that compensatory damages should not be awarded absent proof of actual compensable injury. <u>See</u> <u>id.</u> at 253-67. The defendants contend that the request for compensatory and punitive damages is neither objectively quantifiable or consistent among class members and thus would require highly individualized assessments to determine how to redress specific injuries to individual claimants.

"Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." <u>In re Visa</u>, 280 F.3d at 139. While courts have found that class certification is not defeated by the need to undertake individualized damages determinations, a court must nevertheless consider damages "in deciding whether issues susceptible to generalized proof outweigh individual issues." <u>McLaughlin v. American Tobacco Co.</u>, 522 F.3d 215, 231 (2d Cir. 2008)(internal quotation marks omitted).

The key consideration here is that there was one instance of discrimination that affected the putative class members at the same time and in their position as third-party beneficiaries, as opposed to numerous instances of discrimination over time. An analogous situation was presented in <u>Collins v. Olin Corp.</u>, 248

F.R.D. 95, 104 (D. Conn. 2008). In that case a group of

homeowners filed a class action seeking injunctive and

declaratory relief and damages from a firearms and munitions

manufacturer, which included, inter alia, loss of use and

enjoyment of property, and infliction of emotional distress. In

considering the emotional distress claim, the court noted:

> Regarding the intentional infliction of emotional
> distress claim, [the defendant] argues that an inquiry
> into each plaintiff's mental health and other potential
> causes of emotional distress will need to be conducted in
> order to determine if [the defendant's] actions are
> indeed the proximate cause. However, the plaintiffs
> point out that this inquiry can easily be done in
> conjunction with the inquiry into the actual damages
> sustained by each plaintiff. Furthermore, the remaining
> elements of an intentional infliction of emotional
> distress claim, such as the intent of [the defendant] and
> whether [the defendant] knew its conduct was likely to
> cause distress, and whether [the defendant's] conduct was
> extreme and outrageous, can be made on a class-wide
> basis.

Id. at 104. The court finds Olin more instructive than the cases

relied on by the defendants. See Allison v. Citgo Petroleum

Corp., 151 F.3d 402, 416 (5th Cir. 1998) (where plaintiffs sought

to certify a nationwide class in an action alleging that Citgo

engaged in racial discrimination with respect to general hiring,

promotion, compensation, and training policies at a Louisiana

manufacturing facility, the court held that class certification

was not appropriate because plaintiffs' claims for "compensatory

and punitive damages required particularly individualized proof

of injury"); Stephens v. Seven Seventeen HB Philadelphia Corp.

<u>No. 2</u>, No. Civ.A. 99-4541, 2004 WL 1699331, at *1 (E.D.Pa. 2004)(putative class members had suffered different instances of racial discriminations at night clubs at different times in different places across the country); <u>Gilliam v. HBE Corp.</u>, 204 F.R.D. 493, 495 (M.D. Fla. 2000) (rejecting proposed settlement class which consisted of multiple groups of plaintiffs who either stayed independently, stayed as part of a group, visited, or attempted to visit a hotel during a specified period).

Finally, the court notes the existence of flexible devices for administering classes:

> There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

<u>In re Visa</u>, 280 F.3d at 141. As the other elements of the § 1981 claim can be proven on a classwide basis, the court finds the predominance requirement has been satisfied.

### b. Superiority

In assessing whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy, Rule 23(b)(3) instructs that the matters pertinent to this inquiry include:

> (A) the class members' interests in individually
> controlling the prosecution or defense of separate
> actions; (B) the extent and nature of any litigation
> concerning the controversy already begun by or against
> class members; (C) the desirability or undesirability of
> concentrating the litigation of the claims in the
> particular forum; and (D) the likely difficulties in
> managing a class action.

Fed. R. Civ. P. 23(b)(3). See also In re Nassau Cnty. Strip

Search Cases, 461 F.3d 219, 230 (2d Cir. 2006)

In the instant case, neither the defendants nor the

plaintiffs have argued the class members have any interest in

proceeding separately. Also, the court notes that proof of the

elements of the § 1981 claims all stem from one event affecting

all putative class members simultaneously; it would be needless

repetition for each allegedly wronged member to proceed

individually. See In re MTBE, 241 F.R.D. at 449-50 ("trying each

individual plaintiff's action separately would only lead to

wasteful repetition. . . ."). In addition, a class action will

save an enormous amount in litigation costs for all parties and

allow them to more efficiently pursue their claims and defenses.

Finally, the court does not believe this case presents

difficulties in terms of managing a class action. See In re

Vivendi Universal, S.A., 242 F.R.D. 76, 107 (S.D.N.Y. 2007)("The

determination of whether a particular action is manageable is

'peculiarly' within the discretion of the district court."

(citing In re Visa, 280 F.3d at 141)). Accordingly, the court

finds that a class action is superior to other available methods

for the fair and efficient adjudication of this action.

**F.   Punitive Damages; Bifurcation; Rules Enabling Act**

The defendants construe the plaintiffs' motion as seeking certification of a class for punitive damages.  However, the law is clearly established that such a certification is not permissible.  See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417-20 (2003)(due process rights are violated where punitive damages bear no reasonable relationship to the actual harm suffered or the compensatory damages awarded); In re Simon, 407 F.3d at 138 (noting that, in light of State Farm, a district court erred "[i]n certifying a class that seeks an assessment of punitive damages prior to an actual determination and award of compensatory damages").  No punitive damages class is being certified.

The parties have advanced various arguments with respect to bifurcation on the issue of compensatory damages.  If, as the case develops, handling issues related to individualized damages determinations proves unwieldy, bifurcation is among the options, but not the only option, that can be considered.  See In re Nassau Cnty., 461 F.3d at 231.

The defendants also make an argument based on the Rules Enabling Act, 28 U.S.C. § 2072(b).  See Amchem, 521 U.S. at 612-13 ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which

instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right. . . .'" (citing 28 U.S.C. § 2072(b))).  The defendants point to <u>McLaughlin v. American Tobacco Co.</u>, 522 F.3d 215 (2d Cir. 2008).  However, no scheme such as that in <u>McLaughlin</u>, i.e., proving collective damages on a class-wide basis with individual plaintiffs then claiming shares in a fund, <u>see</u> <u>id.</u> at 231, has ben proposed here.

## IV. CONCLUSION

For the reasons set forth below, the plaintiffs' Renewed Motion for Order Determining That Action Proceed as Class Action (Doc. No. 207) is hereby GRANTED.  The class is certified as "Macedonia Church and those members of Macedonia Church, and those relatives or friends of Macedonia Church members, who participated in a church trip to Lancaster Pennsylvania on July 9-10, 2004, and were denied accommodations at the Lancaster Host."

It is so ordered.

Dated this 30th day of September 2010 at Hartford, Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge
