**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MACEDONIA CHURCH, et al.,    ) | |
|        ) | |
|     Plaintiffs,    ) | Case No.: 05-CV-153 (TLM) |
|        ) | Honorable Tucker L. Melançon |
|    v.      ) | |
|        ) | |
| LANCASTER HOTEL LIMITED    ) | |
| PARTNERSHIP, MASSPA REALTY    ) | [_____], 2011 |
| CORPORATION, AND FINE HOTELS    ) | |
| CORP.,       ) | |
|        ) | |
|     Defendants.    ) | |
|        ) | |

**[PROPOSED] FINDINGS OF FACT AND
CONCLUSIONS OF LAW AND FINAL ORDER OF JUDGMENT**

On February 14, 2011, the Court entered an Order Preliminarily Approving the Parties' Settlement Agreement and Directing Notice to Class Members. That Order granted preliminary approval to the proposed Settlement Agreement in this class action and specified the manner in which the Plaintiffs and their counsel were to provide notice to persons who are members of the class that was certified on September 30, 2010 (the "Class" or "Class Members").

Following the dissemination of the notice to the Class that was approved in the preliminary approval Order, Class Members were given an opportunity to (a) request exclusion from the Settlement, or (b) object to the Settlement Agreement, including a request for attorneys' fees and expenses for counsel for the Plaintiffs and the Plaintiff Class ("Class Counsel") and for service payments to certain designated Named Plaintiffs.

After receiving briefing from the Parties, a Fairness Hearing was held on June 9, 2011, at which time all interested persons were given a full opportunity to state any objections to the Settlement Agreement. The Fairness Hearing was held more than ninety (90) days after

Defendants provided notice of the proposed Settlement to federal and state-level attorneys general as required by 28 U.S.C. § 1715(b), thus complying with 28 U.S.C. § 1715(d).

The Court has considered the submissions and arguments of Class Counsel and counsel for Defendants Lancaster Hotel Limited Partnership, MASSPA Realty Corporation, and Fine Hotels Corp. (the "Defendants' Counsel") regarding the fairness, reasonableness, and adequacy of the proposed Settlement, which is intended to effect a full and final settlement of the certified class claims, including all individual claims subsumed therein that were asserted or could now or hereafter be asserted by Plaintiffs on behalf of themselves and the Class Members with respect to the July 9-10, 2004 trip to Lancaster, Pennsylvania sponsored by Macedonia Church.

The Court makes the following findings of fact. In some instances a finding of fact may also be a mixed conclusion of law and in other instances a conclusion of law may include findings of fact.

## FINDINGS OF FACT

### A. Events Leading Up To The Litigation.

1. Macedonia Church is an independent Pentecostal congregation located in South Norwalk, Connecticut. In 2004, Plaintiff Rev. DeWitt Stevens, Jr. served as pastor and spiritual leader of Macedonia Church.

2. Five ordained ministers, including Rev. Albert Ray Dancy and Rev. Michael Rumble, comprised the Board of Elders, a spiritual arm of Macedonia Church, and eleven individuals, including Rev. Stevens, Addie Stevens, Rev. Dancy, and Rev. Rumble, comprised the Board of Directors, the operational arm of the church.

3. In 2004, Macedonia Church decided to host a summer trip to Lancaster, Pennsylvania for its membership to attend a religious-themed production at the Sight & Sound Millennium Theater, as well as to visit an amusement park in nearby Hershey, Pennsylvania.

4. Macedonia Church assigned Merle Rumble responsibility for organizing the 2004 summer outing.

5. Ms. Rumble visited the Lancaster Host Resort and Conference Center ("LHR"), a hotel near Lancaster, in February of 2003 to investigate lodging options for the trip. LHR was built in the early 1960s as a full service resort located in the heart of what was then Amish country. At the time, LHR consisted of three stories/six levels and housed about 330 hotel guest rooms.

6. During her February, 2003 visit, Ms. Rumble asked an attendant at the front desk to summon a salesperson who could explain the accommodations available at the hotel. Bonnie Skagen, a sales representative for LHR, responded and met Ms. Rumble in the lobby.

7. Ms. Rumble advised Ms. Skagen that she was interested in scheduling a group outing and they discussed information about LHR in the lobby for approximately fifteen minutes. Ms. Skagen gave Ms. Rumble her business card and a brochure about the hotel. Ms. Rumble found Ms. Skagen to be "pleasant" during this meeting.

8. On April 20, 2004, Merle Rumble, along with her husband Rev. Rumble, and Addie and Rev. Stevens, visited LHR. Ms. Skagen talked with the Macedonia Church representatives about the accommodations at LHR and gave them a guided tour of the facilities.

9. After the tour, Ms. Rumble told Ms. Skagen that she wanted to reserve forty rooms for both July 8 and 9, 2004. Ms. Skagen explained to Ms. Rumble the procedures

for reserving group lodging accommodations at LHR, and Ms. Rumble dealt exclusively with her in attempting to make group room reservations at LHR.

10.     Ms. Skagen told Ms. Rumble she would send her an introductory letter or proposal letter.  Ms. Skagen advised Ms. Rumble that she would need to sign a contract and submit a security deposit to confirm the reservations.

11.     Ms. Rumble described Ms. Skagen's demeanor during this visit as "pleasant and cordial" and seemingly "willing to work" with her on the reservations process. She testified that she did not observe Ms. Skagen acting "odd" toward her or her fellow church members.

12.     A few days after this visit to LHR, Ms. Rumble received an introductory letter dated April 21 2004 from Ms. Skagen.  In the letter, Ms. Skagen stated:  "It was a pleasure meeting your group.  I enjoyed showing off our property and hope your group will stay with us from Thursday, July 8 to Saturday, July 10, 2004." The arrival and departure dates listed in the proposal letter accurately reflected the information Ms. Rumble imparted to Ms. Skagen during their in-person meeting, but the number of rooms requested was omitted.

13.     Ms. Rumble next spoke with Ms. Skagen about making reservations at LHR on May 10, 2004.  She had already made reservations for the religious-themed theater performance near LHR for July 10, 2004.  During this telephone call, Ms. Rumble instructed Ms. Skagen to change the group's arrival date from Thursday, July 8, 2004 to Friday, July 9, 2004 and add Sunday, July 11, 2004 to her reservations and reminded Ms. Skagen that the group requested at least 40 rooms per night.  A few days after their conversation, Ms. Rumble received a proposal letter dated May 10, 2004 from Ms. Skagen offering only 20 rooms for each night for July 8-9, 2002 instead of 40 rooms for July 9-10, 2004.

14.     This proposal letter describes reservations of twenty rooms for both July 8 and 9, 2004 and states: "Due to the tentative status of your function, we are presently not holding space for your group. However, if this proposal meets with your approval, we will be happy to reserve the appropriate space and send you an agreement."

15.     On May 17, 2004, Ms. Rumble contacted Ms. Skagen by telephone, advising her that the reservation dates and number of rooms listed in the second proposal letter were incorrect. During this telephone call, Ms. Rumble told Ms. Skagen to send her a tentative contract for reservations of forty rooms for both July 9 and 10, 2004.

16.     Ms. Rumble testified that Ms. Skagen used a "pleasant" tone of voice during this conversation. But Ms. Rumble never received a contract from Ms. Skagen despite Ms. Skagen's responsibility to send one. On May 26, 2004, Ms. Skagen left a voicemail message for Ms. Rumble, seeking to speak with her about her proposed reservations. Ms. Rumble returned Ms. Skagen's telephone call on June 1, 2004, but Ms. Skagen was unavailable at that time. Ms. Rumble called Ms. Skagen on June 1 and June 2, 2004 but could not reach her and left messages with each telephone call. Ms. Skagen did not respond until June 3, 2004. The two finally spoke by telephone later that day on June 3, 2004.

17.     During this telephone conversation, Ms. Skagen stated that LHR did not have rooms available for Macedonia Church group for both July 9 and 10, 2004. Ms. Skagen apologized to Ms. Rumble about the lack of room availability to accommodate her request, stated she did not understand how it could have happened, and offered to help find replacement lodging, suggesting that the group could stay out of town in Reading or Hershey.

18.     Ms. Skagen acknowledged that she neither prepared a contract nor directed her assistant to do so, because if she had done so, there would be evidence in the account recap document, but there was none.

19.     Nothing in the Booking Recap document supplied by Defendants supports the claim that Lancaster Host was overbooked for the dates Macedonia Church wished to stay there, as Mr. Rice, Ms. Skagen's supervisor, admitted.  The Booking Recap document produced by Defendants indicated that the blocked status of the rooms was not changed or removed until June 4, 2004.

20.     On June 8, 2004, Ms. Rumble visited LHR and asked Ms. Skagen to meet with her in the hotel lobby.  Ms. Skagen again told Ms. Rumble that LHR did not have enough rooms available for her group.  Ms. Rumble did not complain to anyone at Fine Hotels at this time regarding her perception that race discrimination explained her inability to secure group reservations at LHR.

21.     Plaintiffs base their claim of race discrimination against Defendants, in part, based on the fact that thirty-five hotel rooms at LHR were available for a fictitious religious group on June 11, 2004, three days after Ms. Rumble's last request.  Rev. Stevens and Judith Addington, a Caucasian woman, who was a friend of Macedonia Church members, developed a strategy to try and reserve rooms at LHR.  Rev. Stevens selected Judith Addington because her voice is distinctively that of a Caucasian woman.

22.     They decided to call Ms. Skagen to solicit rooms from her.  Rev. Stevens and Ms. Addington decided beforehand to contact LHR on two instances, staggering the number of reservations rather than request all their rooms at once.

23.     Ms. Addington first contacted LHR by telephone on or around June 11, 2004, asking Ms. Skagen to reserve thirty-five rooms. Ms. Skagen stated that LHR had that number of rooms available, and faxed her a tentative contract.

24.     On June 21, 2005, Ms. Addington contacted Ms. Skagen to increase the fictitious group's reservations by an additional fifteen rooms. When Ms. Skagen stated that there were additional rooms available, Ms. Addington directed Ms. Skagen to send the final contract to Christophe Nonirit's address, claiming that Mr. Nonirit was a member of her organization and the coordinator for their outing.

25.     A short time later, Mr. Nonirit spoke with Ms. Skagen on behalf of the fictitious group regarding room reservations. Mr. Nonirit described Ms. Skagen's behavior toward him during the June 2004 conversation as "entirely pleasant" and seemingly "interested in accommodating" the fictitious group that he represented. Mr. Nonirit advised Ms. Skagen over the telephone that the group was no longer interested in reserving hotel rooms.

26.     Neither Mr. Nonirit or Ms. Addington ever disclosed their racial background to Ms. Skagen during any of their telephone conversations with her.

27.     Ms. Rumble found a different hotel for the Macedonia Church's trip to Lancaster. The group stayed at the Ramada Brunswick Hotel Conference Center in downtown Lancaster (the "Ramada") instead. The group, however, found the Ramada to be inferior to LHR. The Ramada did not have a golf course or walking trails, which LHR had. The church members who were deposed testified that the Ramada was in an undesirable location and that they witnessed disorderly and criminal conduct, along with police activity, during their stay.

28.     After these events, Ms. Skagen identified a "Macedonia Church" as a target group that she wanted to solicit for the third quarter of 2004, as she received her incentive

pay for meeting such targets, but she never communicated with Ms. Rumble or anyone from Macedonia Church.

29.     On July 9, 2004, the day Macedonia Church had hoped to begin its stay at LHR, groups from the Enon Tabernacle Baptist Church and the Mercy Seat Baptist Church stayed in seventy-five of the rooms at LHR, nearly one-fourth of its capacity.  Bonnie Skagen telephoned Ms. Addington on at least two occasions expressing regret that the group would not be able to visit LHR and that the group was welcome at LHR in the future.  No such solicitations were made to Macedonia Church.

**B.     The Litigation**

30.     This Settlement was reached after more than five years of litigation.

31.     Plaintiffs filed suit against Lancaster Hotel Limited Partnership, MASSPA Realty Corporation, and Fine Hotels Corp. (the "Defendants") on January 27, 2005, alleging that Defendants intentionally denied them accommodations at the Lancaster Host on the basis of race in violation of 42 U.S.C. § 1981 and other federal statutes, and seeking compensatory damages, punitive damages, and attorneys' fees and costs.[1]  Defendants denied these allegations.

32.     Plaintiffs brought suit on behalf of a proposed class that consisted of 114 members of Macedonia Church, or relatives or friends of Macedonia Church members, who participated in the Church trip to Lancaster, Pennsylvania on July 9-10, 2004.  The proposed class included approximately five persons who are not African-American and twenty-six individuals who were minors during the relevant time period.

---

[1] Plaintiffs initially also asserted a violation of 42 U.S.C. § 2000a(b)(1) and sought injunctive relief.  The Parties stipulated and agreed, on or about April 29, 2008, to the dismissal, without prejudice, of that claim as moot based on Defendants' representations that, *inter alia,* Fine Hotels sold its hotel assets in November 2007.

33.     During the litigation, the Parties undertook substantial discovery.  Class Counsel analyzed and reviewed more than 1,700 pages of documents produced by Defendants bearing on the race discrimination allegations, and between them, the Parties took 11 depositions.  In addition, Class Counsel assembled voluminous information from the Named Plaintiffs and Class Members.

34.     On March 24, 2005, Plaintiffs filed a Motion for an Order Determining that Action Proceed as Class Action.  Defendants filed an Opposition, and Plaintiffs filed a Reply.  On July 20, 2007, the Honorable Alvin W. Thompson of the United States District Court issued a Ruling on Plaintiffs' Motion, denying the motion without prejudice.

35.     On April 6, 2006, Plaintiffs filed an Amended Complaint.  On April 18, 2006, Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint for Lack of Subject Matter Jurisdiction.  Plaintiffs' filed an Opposition, and Judge Thompson ruled on the Motion to Dismiss, denying it.

36.     On April 17, 2006, Defendants filed five Motions for Summary Judgment as to the claims of Plaintiffs Sandra Hart, Merle Rumble, Albert Ray Dancy, Cynthia Welfare, and DeWitt Stevens, Jr.  Plaintiffs filed a Consolidated Memorandum of Law in Opposition, and on July 20, 2007, Judge Thompson issued a Ruling on Defendants' Motions for Summary Judgment, denying all five motions.

37.     The Parties engaged in Court-sponsored mediation with ParaJudicial Officer James Hawkins on September 10, 2007, without reaching a compromise.

38.     On October 4, 2007, Defendants filed a Renewed Motion to Dismiss Plaintiffs' Amended Complaint for Lack of Subject Matter Jurisdiction.  After Plaintiffs opposed the motion, Judge Thompson issued an Order denying Defendants' renewed motion to dismiss.

39.    On December 20, 2007, the Parties engaged in a private mediation session with civil rights attorney Joseph Garrison in Connecticut, which again did not resolve the Litigation.

40.    On June 27, 2008, Plaintiffs filed a Second Amended Complaint, which Defendants timely answered.

41.    On July 10, 2008, Plaintiffs filed a Renewed Motion for Class Certification.  Defendants filed a Response Brief, and Plaintiffs filed a Reply Brief.  On September 30, 2010, Judge Thompson certified the issues of liability and compensatory damages as a Rule 23(b)(3) class action.  Plaintiffs' counsel had earlier been appointed Class Counsel by Judge Thompson.

42.    The Court certified a class defined as follows:

> Macedonia Church and those members of Macedonia Church, and those relatives or friends of Macedonia Church members, who participated in a church trip to Lancaster Pennsylvania on July 9-10, 2004, and were denied accommodations at the Lancaster Host (the "Class").

43.    On October 7, 2010, this case was transferred to the undersigned.  On October 14, 2010, Defendants filed an application for leave to appeal the Court's class certification order under Rule 23(f) of the Federal Rules of Civil Procedure with the United States Court of Appeals for the Second Circuit.  Defendants moved to stay proceedings in this Court pending appellate resolution of their Petition and, if granted, their appeal.  The Court denied Defendants' motion to stay pending appeal on October 21, 2010. The Parties thereafter briefed the Rule 23(f) Petition with the Court of Appeals.

44.    On January 20, 2011, Class Counsel and Defendants' counsel participated in a day-long Court-ordered settlement conference in the presence of the undersigned.  Lead

counsel for the class – David Cohen of Wofsey, Rosen, Kweskin & Kuriansky, LLP – and lead counsel for Defendants – Gerald L. Maatman, Jr. of Seyfarth Shaw LLP – appeared before the Court for over 8 hours; Mr. Cohen and Mr. Maatman are experienced, highly capable counsel, who are well-versed in class action litigation. Confidential written submissions regarding possible settlement were considered and discussed, and the Parties engaged in vigorous arms-length negotiations in the presence of the Court. Although the Parties did not reach agreement on January 20, 2011, they continued their arms-length discussions over the following days and, on January 27, 2011, the Parties notified the Court that they had reached an agreement in principle on terms for a settlement.

45.     The Parties intend for the Settlement to resolve all of the claims of the Class Members and all aspects of the Litigation (including any award of attorneys' fees) for a cash payment of $675,000.00.

46.     On January 31, 2011, the Parties filed a Joint Motion to Stay Pending Final Settlement Approval. On February 1, 2011, the Court granted the Joint Motion to Stay in part, staying further discovery pending approval of the Class Action Settlement.

47.     On February 11, 2011, Class Counsel filed their Unopposed Motion for Preliminary Approval of Class Action Settlement as well as a number of related documents, including the Parties' Settlement Agreement, which contained a proposed Notice to Class Members informing them of the terms of the Settlement and instructing them on how to exclude themselves, object, or file a claim for a share of the Settlement proceeds (the "Class Notice").

48.     On February 14, 2011, the Court granted Plaintiffs' Unopposed Motion for Preliminary Approval, finding that the proposed Settlement was negotiated in good faith at arms

length over time by competent and experienced counsel for the parties and with the assistance of a private mediator, a court-appointed ParaJudicial Officer, and the undersigned.

49.     The Court also found that the proposed Settlement appeared to be fair, reasonable, and adequate under Federal Rule of Civil Procedure 23, and that the Class Notice was sufficient and designed to provide notice to as many Class Members and other interested individuals as possible at reasonable cost.  As such, this Court granted preliminary approval of the Settlement Agreement.

50.     The preliminary approval of the Settlement Agreement was expressly subject to final approval of the Settlement Agreement after providing notice, reviewing comments and/or objections, if any, and conducting a fairness hearing.

51.     Upon entry of the Court's Order preliminarily approving the Settlement and directing the dissemination of the Class Notice, the Parties jointly moved to stay consideration of the Rule 23(f) application pending before the Court of Appeals, in light of the Parties' agreement to reach an amicable resolution.  The Court of Appeals granted the application for a stay on March 9, 2011.

52.     On February 17 and 18, 2011, the Class Notice approved by the Court was sent by United States mail and/or electronic mail by Class Counsel to Class Members at current or last known addresses and email addresses.  The Claim Form attached to the Class Notice, as approved by the Court, was sent by Class Counsel to all persons who receive the Class Notice. Seventy-nine class members returned their claim forms to Class Counsel.

53.     On February 25, 2011, Class Counsel filed a written declaration that the Class Notice to the Settlement Class was disseminated in accordance with the Court's February 14, 2011 Order.

54.     In order to opt-out of the proposed Settlement Agreement, Class Members were required to mail their letters requesting exclusion to Class Counsel postmarked no later than March 25, 2011, in the manner specified in the Class Notice, and pursuant to Paragraph 3.5 of the Parties' Settlement Agreement.  Class Members who wished to object to all or part of the proposed Settlement Agreement (as provided in the Settlement Agreement) were required to mail their appearances and letters stating their objections, as described in the Settlement Agreement, to the Clerk of the Court postmarked no later than March 25, 2011, and in the manner, specified in the Class Notice.

55.     No Class Members requested exclusion from the Class, and the Court received no written objections from Class Members by the deadline for objecting that was established in the preliminary approval Order and communicated to Class Members in the Class Notice.

56.     No Class Members opted out of the Settlement within the time specified by the Court or subsequently.  Accordingly, all members of the Class are bound by this Order granting final approval to the Class Action Settlement, the Settlement Agreement, and the releases contained within the Settlement Agreement.  Class Members do not have a further opportunity to opt out of this action.

57.     On June 9, 2011, the Court held a fairness hearing, at which time it considered the submissions of the Parties and heard from counsel.  [No objectors to the Settlement appeared at the fairness hearing.]

## C.     Settlement Amount And Distribution.

58.     Pursuant to the Settlement, Defendants have agreed to pay a settlement amount of $675,000.00.

59.     On the date set forth in the Parties' Settlement Agreement, Defendants have agreed to pay Class Counsel the total sum of $675,000.00 to be distributed as follows:  Rev. Stevens, Addie Stevens, Rev. Rumble and Merle Rumble, a sum of $50,000.00 each; Macedonia Church, a sum of $125,000.00; each remaining member of the Settlement Class, the sum of $1,000.00 each; and Class Counsel, attorneys' fees of no more than one-third of the Settlement Fund (which Class Counsel has calculated at $225,000.00 plus costs).[2]  Class Counsel's award of attorneys' fees and costs is addressed below.  Class Counsel has agreed to pay any unused surplus costs to Macedonia Church.

60.     The Settlement also provides that any portion of the net fund that is not timely claimed by a Class Member under the claim procedure specified in the Settlement shall be paid to Macedonia Church.  In distributing payments to the Class, Class Counsel agreed to honor any written assignments or instructions directing payment to Macedonia Church.  One hundred and six class members have assigned their payments to Macedonia Church.

**D.     Class Representatives' Service Compensation.**

61.     Pursuant to the Settlement, Defendants have agreed to pay $50,000.00 to Rev. Stevens, Addie Stevens, Rev. Rumble, and Merle Rumble as their share of the Settlement proceeds and for their services on behalf of the Settlement Class.  These plaintiffs are among the 106 class members who have assigned their entire shares of the Settlement proceeds directly to Macedonia Church and will receive no Settlement funds personally.

---

[2] Under Plaintiffs' motion for attorneys' fees and costs, the amount of nontaxable costs to be incorporated in the judgment, subject to court approval, is $8,301.50 with an additional $1,698.50 as a reserve for future costs, provided that any unexpended reserve shall be refunded to Macedonia Church.

62.     The Court finds that these four individuals are entitled to service payments because they were instrumental to the pursuit of this action.  They are the only Class Members who had contact with Defendants regarding the Church group's potential stay at LHR, and they primarily were responsible for prosecuting this action and provided Class Counsel with invaluable assistance with the investigation and development of this case.

63.     These four individuals also devoted a considerable amount of time assisting with discovery and sitting for depositions. The Class Members have benefited from the actions of these individuals.

**E.     Class Counsel Fees.**

64.     Class Counsel has applied to the Court for an award of attorneys' fees and costs, including costs anticipated in connection with administration of the Settlement.  The Settlement Agreement provides that Class Counsel has agreed that any potential recovery for attorneys' fees shall not exceed one third of the Common Fund.

65.     At least 106 of the plaintiffs have signed contingency fee agreements authorizing, as a matter of contract, a one-third contingency fee to Class Counsel plus costs.

66.     In the Settlement Agreement, Defendants have agreed not to oppose Class Counsel's application of record insofar as the request does not exceed more than one-third of the total settlement amount of $675,000.00.  Pursuant to the Settlement Agreement, in the event the Court awards a lesser amount of fees or costs to Class Counsel than one-third of the Common Fund, the Settlement Agreement shall remain in full force and effect, and the amount of any reduction will be paid to the Church.  Class Counsel has moved for an award of attorneys' fees and costs in total amount of $235,000.00, representing attorneys' fees of $225,000, costs to date of $8,301.50, and a reserve for future costs of $1,698.50.  The award of fees and costs is

supported by an affidavit of counsel and a supporting memorandum, falls within the guidelines established by the Settlement Agreement, and has not been opposed by any objection from the defendants or from any of the Class Members, the overwhelming majority of whom signed written agreements establishing fees in this amount.

### F. Class Members Who Are Minors.

67. Some of the Class Members are minors. At the time the action was commenced and in pursuing investigation in furtherance of the Litigation, Class Counsel learned the identities of the parents, next friends and/or legal guardians of the minor Class Members.

68. Class Counsel has ensured that the parents, next friends and/or legal guardians of minor Class Members received the Class Notice, completed and properly signed the Claim Form in accordance with the requirements set forth in the Class Notice, executed properly the Class Member release agreement pursuant to the terms the Settlement Agreement, and will receive payments from the Settlement Fund, unless their share of the settlement has previously been assigned to Macedonia Church, if they submitted to Class Counsel a timely, complete, and valid Claim Form.

## II.  CONCLUSIONS OF LAW

1. Federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy" favoring settlement, "particularly in the class action context"); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of

litigation."); *see also* 4 William B. Rubenstein, et al., *Newberg on Class Actions* § 11.41 (4th ed. 2010) (collecting cases).

2.     The *Manual for Complex Litigation*, prepared by the Federal Judicial Center, describes a three-step procedure for approval of class action settlements:

> A.     Preliminary approval of the proposed settlement at an informal hearing;
>
> B.     Dissemination of mailed and/or published notice of the settlement to all affected class members; and
>
> C.     A "formal Rule 23(e) fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

*Manual for Complex Litigation* (Fourth) § 21.632-34 (2004).

3.     This procedure, used by courts in this Circuit and endorsed by class action commentator Professor Herbert Newberg, safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. *See* 4 *Newberg on Class Actions* § 11.24, *et seq.* A presumption of fairness, adequacy, and reasonableness attaches to a class settlement "reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores*, 396 F.3d at 116; *see also Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003) ("[A] strong presumption of fairness attaches to proposed settlements that have been negotiated at arm's length.").

4.     On February 14, 2011, the Court determined preliminarily that the Settlement is fair, reasonable and constitutes a beneficial resolution to this litigation.

5.     Pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, a court may give final approval to a class action settlement only upon finding that it is "fair, adequate, and reasonable, and not a product of collusion." *Wal-Mart Stores, Inc.*, 396 F.3d at 116. This

requires an assessment of both procedural and substantive fairness. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("The District Court determines a [class action] settlement's fairness by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms." (citing *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983))).

6.    To decide whether a class action settlement is procedurally fair, a Court "must pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *D'Amato*, 236 F.3d at 85 (citation and internal quotation marks omitted).

7.    The Court concludes that the proposed Settlement was negotiated in good faith at arms length over time by highly competent and experienced counsel for the Parties and with the assistance of a private mediator, a court-appointed ParaJudicial Officer, and the undersigned. Mr. Cohen, as counsel for the class, and Mr. Maatman, as counsel for Defendants, are familiar with the legal and factual issues of this case in particular and with class action litigation in general and they vigorously pursued their clients' respective positions and negotiated at arms length and in good faith in resolving this class action. Accordingly, the proposed Settlement is procedurally fair.

8.    In evaluating substantive fairness, it is well settled that the District Court must consider the nine *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible

18

recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir. 2000); *see also Wal-Mart Stores, Inc.,* 396 F.3d at 117.

9.      In accordance with these factors and the terms of the Settlement Agreement, this Court finds that the proposed Settlement is fair, reasonable and adequate under Federal Rule of Civil Procedure 23(e).

10.      First, the proposed Settlement would resolve the 42 U.S.C. § 1981 claims certified by the Court in the Order dated September 30, 2010.  The class defined in the proposed Settlement Agreement is the same as that defined in that Order.

11.      Second, the complexity, expense, and duration of the litigation – along with the risks attendant to further litigation – support final approval.  *Grinnell*, 495 F.2d at 462-63.  In deciding to settle rather than continue with further litigation, both sides have weighed the relative risks and rewards of continuing to litigate this case to final judgment, followed by the inevitable appeals initiated by one or both sides.  They have concluded that trial on the merits and any resulting recovery for Class Members would involve significant uncertainty, expense, and delay, all of which show the Settlement is a fair method of alleviating these risks and providing reasonable relief to the Class Members.  Serious questions of law and fact exist such that the value of an immediate recovery outweighs the mere possibility of further relief after protracted and expensive litigation.  *See D'Amato*, 236 F.3d at 86 (citing *In Re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 179 (S.D.N.Y. 2000)).

12. Third, the Court gives weight to the Parties' judgment that the settlement is fair and reasonable, as well as to the Class's favorable reaction to the settlement. *Wal-Mart Stores*, 396 F.3d at 118 ("the class appears to be overwhelmingly in favor of the Settlement. . . . 'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.'" (quoting 4 Newberg on Class Actions § 11.41, at 108)). No objections by the Class Members were submitted to the Court in response to the notice of the Settlement.

13. Fourth, the history of this litigation demonstrates that it is at a stage where approval of the Settlement is appropriate. Substantial discovery and motion practice – including motions to dismiss, summary judgment, and class certification – has been undertaken by both sides. The fact that the Parties have litigated summary judgment and have participated in mediation means that the stage of the proceedings is sufficiently ripe for final settlement approval. *Wal-Mart Stores*, 396 F.3d at 118.

14. Fifth, the risks associated with maintaining class certification and the ability of the Defendants to withstand a greater judgment favor final approval. *Wal-Mart Stores*, 396 F.3d at 119 n.24 ("decertification is always possible as a case progresses and additional facts are developed"). Defendants' counsel and Class Counsel alike believe that the amount of money to be paid by Defendants into the Settlement is fair and reasonable. *Wal-Mart Stores*, 396 F.3d at 117; *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). Even if a verdict were returned against Defendants for a higher sum and they were able to fulfill it, that would not make the Settlement unfair. Rather, a consideration of all of the factors here justifies approving the Settlement. *D'Amato*, 236 F.3d at 86.

15. Sixth, this Court finds that the Notice to Class Members provided the best notice as practicable under the circumstances, as it was sent individually to all Class Members who

were identified by the reasonable efforts of Class Counsel. The Notice therefore meets the requirements of Federal Rule of Civil Procedure 23(c) and due process.

16. The Class Notice was disseminated to those persons who fit the class definition in the class certification order of September 30, 2010, and the Court finds those persons to be Class Members.

17. The Class Notice stated clearly and concisely in easily understood language the nature of the class action, the definition of the certified Class, the issues and defenses asserted by the Parties, that Class Members may enter an appearance in the action through an attorney if so desired, that the Court will exclude from the Class any Class Member who submits a timely request for exclusion, and the binding effect of a class judgment on Class Members under Federal Rule of Civil Procedure 23(c)(3).

18. Pursuant to this Court's Preliminary Approval Order, the Notice was sent by first class mail to each identified class member at his or her last known address (with a remailing of returned Notices).

19. The Class Notice, therefore, fairly and adequately advised the members of Class of the terms of the Settlement and the claims process for the members of the Class to obtain the benefits available the claims process, as well as the right of members of the Class to opt out of the class, to object to the settlement, and to appear at the fairness hearing. Class Members were provided the best notice practicable under the circumstances. The Notice and distribution of such Notice comported with all constitutional requirements, including those of due process.

20. Seventh, no Class Members objected to the proposed Settlement. It is well established that a settlement can be fair notwithstanding a large number of objectors. *See, e.g., TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 462 (2d Cir. 1982) (approving

21

settlement despite objections of approximately 56% of class); *Reed v. General Motors Corp.,* 703 F.2d 170, 174-75 (5th Cir. 1983) (approving settlement despite opposition of 40% of class); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977) (approving settlement despite objections of counsel purporting to represent almost 50% of class). Even so, none of the Class Members here filed an objection to the proposed Settlement.

21. Eighth, service compensation awards "are not uncommon in class action cases and are within the discretion of the court." *Velez v. Majik Cleaning Serv., Inc.*, 03 Civ. 8698 (SAS)(KNF), 2007 U.S. Dist. LEXIS 46223, at *22 (S.D.N.Y. June 22, 2007). In reviewing service compensation, courts consider:

> The existence of special circumstances including the personal risk (if any) incurred by the plaintiff applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course, the ultimate recovery.

*Id*. (quoting *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005)).

22. The amount of the service compensation for Class Representatives "is related to the personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." *Mentor v. Imperial Parking Sys.*, 05 Civ. 7993 (WHP), 2010 U.S. Dist. LEXIS 132831, at *6 (S.D.N.Y. Dec. 15, 2010) (citation and internal quotation marks omitted). *See also Roberts v. Texaco, Inc.,* 979 F. Supp. 185, 200-01 (S.D.N.Y. 1997); *Gilliam v. Addicts Rehabilitation Ctr. Fund*, 05 Civ. 3452 (RLE), 2008 U.S. Dist. LEXIS 23016, at *14-15 (S.D.N.Y. Mar. 24, 2008) (compensation to six named plaintiffs for services to class "reasonable" and "appropriate use of the overall settlement").

23. Payments of $50,000.00 are reasonable and adequate for the following plaintiffs: Rev. Stevens, Addie Stevens, Rev. Rumble, and Merle Rumble (together the "Representative Plaintiffs"). Accordingly, the Court finds those payments shall be made to the Representative Plaintiffs.

24. Ninth, the amount of fees requested by Class Counsel is fair and reasonable using the percentage-of-recovery method, which is consistent with the "trend in this Circuit." *Wal-Mart Stores, Inc.*, 396 F.3d at 121; *see Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini,* 258 F. Supp. 2d 254, 261-62 (S.D.N.Y. 2003) (collecting cases); *In Re NASDAQ Market-Makers Antitrust Litigation,* 187 F.R.D. 465, 483-85 (S.D.N.Y. 1998) (collecting cases).

25. Class Counsel's request for 33-1/3% of the Settlement Fund is typical in class action settlements in the Second Circuit. *See, e.g., Gilliam,* 2008 U.S. Dist. LEXIS 23016, at *8; *Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, 06 Civ. 4270 (PAC), 2009 U.S. Dist. LEXIS 27899, at *16 (S.D.N.Y. Mar. 31, 2009) (noting that a request for one-third of the Settlement Fund "is typical in class action settlements in the Second Circuit" and collecting cases); *Strougo*, 258 F. Supp. 2d at 262 (33 1/3% of settlement fund approved for attorneys' fees); *In Re Blech Sec. Litig.,* No. 94 Civ. 7696 (RWS), 2002 U.S. Dist. LEXIS 23170, at *5 (S.D.N.Y. Dec. 4, 2002) (33 1/3% of settlement fund approved for attorneys' fees, plus costs); *Adair v. Bristol Technology Sys.,* No. 97 Civ. 5874, 1999 U.S. Dist. LEXIS 17627, at *8-9 (S.D.N.Y. Nov. 16, 1999) (33% of settlement fund approved for attorneys' fees, plus costs); *Cohen v. Apache Corp.,* No. 89 Civ. 0076 (PNL), 1993 U.S. Dist. LEXIS 5211, at *1 (S.D.N.Y. Apr. 21, 1993) (33 1/3% of settlement fund approved for attorneys' fees).

26. The amount of fees requested is fair and reasonable. Class Counsel have committed substantial resources to prosecuting this case. Class Counsel completed substantial

work identifying, investigating, prosecuting, and settling Plaintiffs' and the Class Members' claims.  The work that Class Counsel have performed both in litigating and settling this case demonstrates their commitment to the class and to representing the class' interests.  The attorneys' fees were entirely contingent upon success.  Class Counsel risked time and effort and advanced costs and expenses, with no ultimate guarantee of compensation.  At least 106 of the plaintiffs have signed contingency fee agreements authorizing a one-third contingency fee to Class Counsel plus costs.

27.    The amount of fees and costs claimed, upon all of the evidence, is fair, just and reasonable and is hereby established as $235,000.00.

Having read and fully considered the terms of the Settlement Agreement, and all submissions made in connection with it, the Court finds that the Settlement Agreement should be finally approved and the Litigation dismissed with prejudice as to all Class Members.

**IT IS HEREBY ORDERED** that:

1.    All of the terms and provisions of the Settlement Agreement, which the Court previously gave preliminary approval and found to be fair, reasonable, and adequate as it applies to the Class, are given final approval for purposes of Rule 23(e).  The Court orders consummation of all of the terms and provisions of the Settlement Agreement.

2.    In addition to the payments to Settlement Class Members provided for in the Settlement Agreement, the Court awards payments in the amount of $125,000.00 to Macedonia Church and $50,000.00 each to DeWitt Stevens, Jr., Addie Stevens, Michael Rumble, and Merle Rumble and directs Defendants to pay such amounts through Class Counsel.  The Court has been advised that Class Counsel will honor the assignments in favor of Macedonia Church previously

made by Pastor and Mrs. Stevens, Pastor and Mrs. Rumble, and most of the members of the Settlement Class.

3.      Class Counsel's Fee and Expense Application is hereby granted.

4.      The Settlement Agreement shall be binding on all Defendants and all Plaintiffs, including all members of the Class who have not been excluded pursuant to the Settlement Agreement.

5.      The Court hereby dismisses on the merits and with prejudice the Second Amended Complaint filed in this Court, styled *Macedonia Church, et al. v. Lancaster Hotel Limited Partnership, et al.*, Case No.: 05-CV-153 (TLM).  In addition, the Court also dismisses all claims which any Class Members alleged or could have alleged in any way relating to or arising out of Defendants' alleged denial of accommodations on the basis of race, alleged race discrimination, or alleged violations of law.  Upon the Effective Date of Final Approval as defined in the Settlement Agreement, the Named Plaintiffs and each Class Member shall be deemed to have, and by operation of these Findings of Fact and Conclusions of Law and Final Judgment shall have, released, waived and discharged Lancaster Hotel Limited Partnership, MASSPA Realty Corporation, and Fine Hotels, Corp., including all of their past, present, and future direct and indirect parents, affiliates, subsidiaries, divisions, predecessors, successors, partners, joint venturers, affiliated organizations, insurers, assigns, and each of their past, present, and future officers, directors, members, trustees, agents, employees, attorneys, contractors, representatives, and any other persons or entities acting on their behalf (the "Released Parties") from any and all claims, debts, liabilities, demands, obligations, guarantees, penalties, costs, expenses, attorneys' fees, damages, actions, or causes of action of every type and description, of whatever kind or nature, whether known or unknown, that were alleged or

could have been alleged in the Litigation or that in any manner arise out of or relate to Defendants' alleged denial of accommodations on the basis of race, alleged race discrimination, or alleged violations of law, that have asserted or could have been asserted against the Released Parties at any time up to and including the Effective Date of Final Approval.

6.      If (a) the Effective Date of Final Approval does not occur for any reason whatsoever, or (b) the Settlement Agreement becomes null and void pursuant to the terms of the Settlement Agreement, these Findings of Fact and Conclusions of Law and Final Order and Judgment shall be deemed vacated and shall have no force or effect whatsoever.

7.      Without affecting the finality of the Findings of Fact and Conclusions of Law and Final Order and Judgment, the Court reserves continuing and exclusive jurisdiction over the parties, including all members of the Class as defined above, and the execution, consummation, administration, and enforcement of the terms of the Settlement Agreement.

8.      The Clerk is directed to enter these Findings of Fact and Conclusions of Law and Final Order and Judgment forthwith.

**SO ORDERED** THIS _____ DAY OF _____, 2011.

_____
Hon. Tucker L. Melançon
United States District Court Judge
for the District of Connecticut